## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

Leonard Kidd, (N23646),      )
)
             Petitioner,    )
)      Case No. 17 C 7031
      v.        )
)      Hon. Robert W. Gettleman
)
Randy Pfister, Warden,    )
Stateville Correctional Center,    )
)
          Respondent.    )

## MEMORANDUM OPINION AND ORDER

Petitioner Leonard Kidd, a prisoner incarcerated at the Stateville Correctional Center, brings this counseled amended habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his convictions for quadruple murder, armed robbery, aggravated arson, and concealment of a homicidal death in the Circuit Court of Cook County. He alleges: (1) his confession was coerced through torturous interrogation by the police and was wrongfully introduced at his trial; (2) ineffective assistance of trial counsel at the suppression hearing for failing to investigate and present evidence supporting his coerced confession claim; and, (3) the state court made an unreasonable determination of fact that the police did not torture him. He also requests an evidentiary hearing. The Court denies the petition on the merits, and declines to issue a certificate of appealability.

## I.    Background

The Court draws the following factual history from the state court record and appellate opinions. (Dkt. 1, 4, 16.) State court factual findings, including facts set forth in state court appellate opinions, have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. *Brumfield v. Cain*, 576 U.S. 305, __, 135 S.

Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C § 2254(e)(1)); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citations omitted).

**A.     Evidence Introduced at Petitioner's Trial**

The evidence at Petitioner's trial showed that on the morning of January 12, 1984, the bodies of Renee Coleman, her nine-year-old son, Anthony, Michelle Jointer, and Ricardo Pedro, were discovered in an apartment building in Chicago. *Illinois v. Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *1 (Ill. App. Ct. Mar. 31, 2016).   The victims died of repeated stab wounds. *Id*.   Coleman, her son, and Jointer lived at the apartment. *Id*. at *5.

**1.     Evidence Unrelated to Petitioner's Confessions**

The neighbor living in the apartment immediately below the victims, and who was friends with Coleman and Jointer, testified that he heard a commotion coming from the victim's apartment at 4:15 a.m., on the morning of the murders. *Id*. at *5.   This was followed by Renee Coleman shouting, "you guys, stop it; you guys, stop it." *Id*.   The neighbor did not hear another sound from the upstairs apartment until 6 a.m., when he heard what sounded like people shuffling around. *Id*.   He then heard Renee and Anthony Coleman crying out hysterically. *Id*.   Everything became very quiet two minutes later. *Id*.

The neighbor called the police. *Id*.   A few minutes later, the neighbor heard a person outside saying the apartment building was on fire. *Id*.   Water and smoke began coming into the neighbor's apartment from the above apartment. *Id*.   The neighbor fled from the building after unsuccessfully attempting to put out the fire in the victims' apartment. *Id*.

The fire department would extinguish the fire. *Id*.   One of the firefighters on the scene testified that, while he was outside the apartment building after extinguishing the fire, Petitioner

approached him asking if anyone was dead in the building.  *Id*. at *11.  The firefighter responded that four bodies were recovered.  *Id*.  Petitioner then asked if the bodies had been burnt, to which the firefighter said no.  *Id*.  Petitioner responded "Damn," and then walked away.  *Id*.  The firefighter contacted the police two days later after seeing Petitioner's picture in the newspaper along with an article about the fire.  *Id*.  The firefighter admitted on cross examination that he was not 100% sure if Petitioner was the man he spoke to as Petitioner's trial occurred nine and half years after the killings.  *Id*. at *12.

Chicago Police Department Detectives Robert Flood and Dennis McGuire were assigned from Area 2 violent crimes to investigate the murders.  *Id*. at *6, *9.  They arrived at the victims' apartment at 8:30 a.m. on the morning of the killings finding it severely damaged by the fire.  *Id*. at *6.  The four victims' bodies were in the back bedroom.  *Id*.  Pedro was bound by a scarf, and stab wounds were visible on his neck.  *Id*.  Jointer's hands were tied behind her back with an extension cord, and an article of clothing was tied around her neck.  *Id*.  Renee Coleman's hands were bound by a telephone extension cord with a cloth around her neck.  *Id*.  Anthony's hands were also bound with a telephone cord, and a cloth wrapped tightly around his neck as well.  *Id*.

Subsequent autopsies found that Pedro, Jointer, and Renee Coleman had traces of cocaine in their systems.  *Id*. at *7.  The medical examiner estimated they consumed cocaine within three hours of their deaths.  *Id*.  Anthony Coleman's test was negative for drugs or alcohol.  *Id*.  Pedro had 10 stab wounds to his face, neck, and chest.  *Id*.  Michelle Jointer suffered 14 stab wounds to her chest, shoulder, back, and thigh.  *Id*.  Renee Coleman had 17 stab wounds and 18 incision wounds to her face, chest, back, forearm, and hand.  *Id*.  Anthony Coleman had seven stab wounds and six incision wounds to his head and chest.  *Id*.

3

A police bomb and arson specialist concluded that two separate fires were set in the apartment, one in a front bedroom and the other in the back bedroom where the bodies were found. *Id*. at \*12. No accelerants, such as gasoline, were used to start the fires. *Id*. A police evidence technician could not recover any fingerprints suitable for comparison due to the severity of the smoke, soot, water, and fire damage in the apartment. *Id*.

Despite the fire, the detectives recovered documents and pictures in the bedroom where the victims' bodies were discovered. *Id*. at \*6. One item was a public assistance application listing a woman named Eniwotec Durr. *Id*. Various photographs of people, and a green address book with addresses and telephone numbers was also recovered. *Id*. At approximately noon that day, Detective Flood spoke to Durr who identified Leroy Orange as one of the men in the photographs. *Id*. Orange's name was also in the address book. *Id*.

Orange was an acquaintance of the victims, and Petitioner's half-brother.[1] *Illinois v. Orange*, 659 N.E.2d 935, 938 (Ill. 1995). Flood determined the phone numbers listed for Orange were for his wife's and mother's homes. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at \*7.

A group of officers went to both locations at approximately 3:00 p.m. on the day of the murders. *Id*. at \*6. Orange's wife said that she did not know his location. *Id*. at \*7. She explained that Orange left their home the night before at approximately 7:00 p.m., and did not return that evening. *Id*. His wife went to work at 9:00 a.m. that morning and returned around

---

1 The state court opinions at different times refer to Orange and Petitioner as brothers, *Illinois v. Orange*, 521 N.E.2d 69, 71 (Ill. 1988); half-brothers, *Illinois v. Orange*, 659 N.E.2d 935, 938 (Ill. 1995); and stepbrothers. *Illinois v. Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at \*1 (Ill. App. Ct. Mar. 31, 2016). The Court understands the Orange and Petitioner are half-brothers, but the exact familial relationship is irrelevant to the Court's resolution of the present habeas corpus petition.

2:00 p.m. *Id.* Orange's wife found clothes belonging to Petitioner in the apartment when she returned from work that day. *Id.* Petitioner's clothes were not there when she went to work that morning. *Id.* Orange's wife called Orange's mother's home speaking to Orange on the phone. *Id.* She told the police Orange's location. *Id.* Flood and other officers arrested Orange at his mother's home. *Id.*

A short time later, Orange's wife received a call from Petitioner asking to meet because he had something to tell her that "could put me and [Orange] away for the rest of our lives." *Id.* She agreed to meet Petitioner at a nearby McDonald's at 4 p.m. *Id.* Orange's wife related to the police what Petitioner said, and the plan to meet at the McDonald's. *Id.* Petitioner met Orange's wife at the McDonald's where he told her that Orange had paid someone to stab Renee Coleman. *Id.* at *8. The police arrested Petitioner at the McDonald's following his statement to Orange's wife. *Id.*

### 2. Petitioner's Confessions

#### a. Petitioner and Orange's Confessions at Area 2 Headquarters

Orange, his wife, and Petitioner were taken to Chicago Police Area 2 headquarters. *Id.* at *8, *17. Orange's wife, who saw Orange at Area 2, said he was wearing different clothes than those he wore when he left their apartment the prior evening. *Id.* at *8. Orange and Petitioner were isolated from one another and questioned separately. *Id.* at *17. Flood and McGuire conducted the questioning. *Id.*

The officers began questioning Orange at Area 2 at 3:30pm, approximately a half hour after his arrest. *Id.* McGuire testified that Orange said that two men came to the apartment, and

that the men were mad at "Rick" for a drug deal that had ended badly. *Id*. Orange identified the men as "Ricky Jones," and "Slick Rick." *Id*.

At approximately 5:15 p.m, a little more than an hour after his arrest, Flood and McGuire, questioned Petitioner at Area 2. *Id*. at *9. McGuire testified at trial that he read Petitioner his *Miranda* rights and Petitioner acknowledged that he understood them. *Id*.

Per McGuire's trial testimony, Petitioner stated that he went to Orange's girlfriend's apartment that morning around midnight and stayed until 4:30 a.m. *Id*. Petitioner said he heard an argument between Orange and one of the victims, Pedro. *Id*. Petitioner stepped out of the apartment as the argument became violent. *Id*. As Petitioner exited the apartment, two men entered the apartment displaying knives. *Id*. Petitioner initially said he went home, but later said he waited outside the apartment. *Id*. Petitioner identified the men as "Slick Rick," and "Ricky Jones." *Id*. He would later admit that he made up the name Ricky Jones, but asserted Slick Rick was the name of the man in the apartment. *Id*.

According to McGuire, Petitioner said the men exited the apartment with knives and one of them was covered in blood. *Id*. Orange exited the apartment a short time later, and he and Petitioner took a bus home. *Id*. On the ride home, Petitioner asked Orange what happened, and Orange replied, "We cut them up real bad." *Id*.

McGuire also said he asked Petitioner about the gold colored watch he was wearing. *Id*. Petitioner said he exchanged his combination tv radio player with Pedro for the watch. *Id*. Pedro's mother later identified the watch as belonging to Pedro. *Id*. at *11. McGuire informed Petitioner that a tv radio player was not recovered at the crime scene, but one was found at Petitioner's home. *Id*. at *9.

6

Flood and McGuire left Petitioner and interviewed Orange from 5:45 to 6 p.m. *Id*. They then brought Petitioner briefly into Orange's room to show Orange that Petitioner was in custody. *Id*. At approximately 6:30 p.m., Orange was brought to Petitioner's room, where he told Petitioner that he, Orange, had committed the murders by himself and there was no one named "Slick Rick." *Id*. Petitioner informed the officers that he made up the name "Slick Rick" because he did not want Orange to be blamed exclusively for the four murders. *Id*. Petitioner told the officers that he might be able to take them to a location to recover evidence. *Id*.

Detective Raymond McNally testified that he, along with Detectives John McCabe, and Samuel Dioguardi, took Petitioner from the police station to an alley where they recovered a freebasing pipe, spoon, burnt debris, and clothing. *Id*. at *10. The items were collected by the crime lab, and Petitioner was returned to Area 2 police headquarters. *Id*.

At approximately 10:30 p.m., the officers again interviewed Petitioner. *Id*. This time, Petitioner implicated himself and Orange in the crimes. *Id*. Petitioner explained that he was at a bar on January 11, 1984 (the night before the murders) when Orange and Renee Coleman showed up and asked for his combination tv radio. *Id*. The group went to Petitioner's home, where he gave the tv radio to Orange. *Id*. Orange and Renee Coleman departed, and Petitioner initially went back to the bar on his own, but then returned back home. *Id*.

At 12:30 a.m. on the morning of the murders, Orange called Petitioner asking him to come to Renee Coleman's apartment saying he needed Petitioner's assistance. *Id*. The victims were all alive at 1:30 a.m. when Petitioner arrived at the apartment. *Id*. Orange offered him cocaine when he arrived, but he refused. *Id*. Orange and Pedro then had an argument that became violent. *Id*. Pedro was armed with a razor blade and Orange had a knife. *Id*. Orange stabbed

Pedro and continued to do so in the back bedroom. *Id*. Orange then tied Pedro's hands and feet and left him in the bedroom. *Id*.

Petitioner says he tried to comfort Pedro and stop his bleeding with a towel. *Id*. At this point, Renee and Anthony Coleman were also in the back bedroom with Petitioner and Pedro while Orange and Jointer were having sex in the front bedroom. *Id*.

Orange brought Jointer to the back bedroom with her hands bound behind her back and a gag in her mouth. *Id*. Orange and Pedro again argued, and this time Orange stabbed Pedro in the head killing him. *Id*. Orange tied up Renee and Anthony Coleman and stabbed both of them. *Id*. Jointer said, "don't do it, don't do it," but Orange stabbed her as well. *Id*.

Orange and Petitioner gathered up the things they wanted from the apartment including Petitioner's tv radio. *Id*. Petitioner also took Pedro's watch. *Id*. Petitioner's statement is inconsistent regarding the watch. At a different time, he said that Pedro gave him the watch, but that too is inconsistent as Petitioner said Orange had killed Pedro before Pedro gave Petitioner the watch. *Id*. Petitioner stated that he and Orange set the apartment on fire and then disposed of the knives, drugs, pipe, and pair of pants in the garbage can in an alley behind the apartment before going home. *Id*.

At approximately the same time that Petitioner gave this statement to the police, officers took Orange to his wife's apartment. *Id*. at *11. Orange identified a blue sweater that he said he wore during the murders. *Id*. Petitioner was later taken to a different location where he led the police to a knife in a dumpster in an alley. *Id*.

Upon returning to Area 2 headquarters, Petitioner was interviewed by Dennis Dernbach, a deputy supervisor in the Cook County State's Attorney's felony review unit at 12:45 a.m. *Id*. at

8

*12.   After interviewing Petitioner for 30 minutes, Dernbach asked if Petitioner would agree to having a court reporter record his statement.   *Id*.   Petitioner gave an oral statement that was transcribed by a court reporter.   *Id*.   The court reporter also took a Polaroid photograph of Petitioner.   *Id*.

The statement was introduced into evidence at Petitioner's trial.   *Id*.   Petitioner was read and stated he understood his *Miranda* rights in the statement.   *Id*.   The transcribed statement was substantially consistent with Petitioner's prior statement he gave to the police that Orange contacted him for the tv radio, later asked him to come to the apartment, and Orange tied up and stabbed the victims after a dispute with Pedro.   *Id*.   Petitioner also stated that Pedro initially gave him the watch, but this time said he (Petitioner) put it on the dresser but Orange later took the watch.   *Id*.   Petitioner also stated that he and Orange disposed of the knives in the garbage in the alley, and later took the police to recover them.   *Id*.   He also claimed that Orange tried to burn the clothes he had been wearing.   *Id*.

Orange also gave a statement to ASA Dernbach at approximately 4:00 a.m. on the day following the murders that was transcribed by a court reporter.   *Id* at *14.   He too received *Miranda* warnings.   *Id*.   Orange's statement was consistent with Petitioner's.   *Id*.   Orange admitted to stabbing all of the victims.   *Id*.   He explained that he had asked to borrow Petitioner's tv radio player so that he could use it to purchase cocaine.   *Id*.   Orange also called Petitioner to come to the apartment because Orange was having issues with Pedro.   *Id*.

The following morning at 9:30 a.m., Petitioner took several officers to another alley where he led them to two additional knives.   *Id*. at *11.   The tip was missing on one of the knives.   *Id*.   The knives were collected by evidence technicians.   *Id*.

9

A crime lab analyst found trace amounts of blood on each of the recovered knives. *Id*. at *12. One of the recovered knives had a trace amount of blood belonging to Pedro. *Id*. The analyst was unable to determine whether any blood was on the clothes recovered from Petitioner and Orange. *Id*.

### b.    Petitioner's Confession at Orange's Trial

The Court must first address the events leading up to Petitioner's testimony confessing to the murders at Orange's trial. Private attorney Earl Washington represented both Petitioner and Orange for the first few months of the case until Washington withdrew from representing Petitioner due to a conflict of interest on April 19, 1984. *Illinois v. Kidd*, 687 N.E.2d 945, 964 (Ill. 1997). A Cook County assistant public defender was appointed to represent Petitioner, while Washington continued to represent Orange. *Id*. Petitioner and Orange's cases were severed at an early stage in the pretrial proceedings. *Id*.

Following Washington's withdrawal from representing Petitioner, Orange told Washington that he believed Petitioner was involved in unrelated murders --- a separate arson at an apartment building in Chicago on October 28, 1980, that killed 10 children. *Id*. at 949. Washington related the information to the Cook County State's Attorney's office who interrogated Petitioner on that matter. *Id*. at 964. Washington claimed that Orange informed him about the other case and asked that he contact the State's Attorney's office to buttress Orange's position that Petitioner committed the arson in the instant case. *Id*. Petitioner was convicted and is serving a life sentence for ten counts of murder and arson in the 1980 case. *Kidd v. Lemke*, 734 F.3d 696, 697 (7th Cir. 2013). His state direct appeal and postconviction proceedings, and federal habeas corpus proceedings for this separate case are now complete. *Id*. (affirming denial of habeas

10

corpus petition).   Petitioner is presently serving a life sentence without the possibility of future release for these murders.   *Id*.

A year later, in May 1985, Petitioner decided to testify at Orange's trial.   *Illinois v. Kidd*, 544 N.E.2d 432, 437 (Ill. 1989).   Petitioner's public defender represented to the trial court that he had informed Petitioner of his Fifth Amendment rights, and advised him against testifying at Orange's trial.   *Id*.   The public defender ascertained, after questioning Petitioner, that it was Petitioner's decision to testify at Orange's trial.   *Id*.

Petitioner stated that he was voluntarily testifying after conferring with his lawyer.   *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *14.   Petitioner's testimony implicated himself in the murders while exculpating Orange.   *Id*.   He explained that he came to the apartment around 2:00 a.m. on the morning of the killings.   *Id*.   Petitioner drank alcohol, smoked cocaine, and played cards with Orange, Renee Coleman, and Jointer.   *Id*.   Pedro provided the cocaine.   *Id*.

Petitioner testified that Orange left the apartment at 2:30 a.m.   *Id*.   Petitioner and Pedro then smoked cocaine and PCP.   *Id*.   Pedro asked Petitioner for money for the drugs he had just smoked, and Petitioner responded by unplugging his tv radio in the kitchen.   *Id*.   Pedro approached Petitioner with a butcher knife.   *Id*.   Petitioner said he became scared and knocked the knife from Pedro's hand.   *Id*.   He retrieved the knife and stabbed Pedro.   *Id*.

Anthony Coleman walked into the room announcing that Pedro was bleeding, while Renee Coleman and Jointer moved towards the back bedroom.   *Id*.   Petitioner grabbed Anthony Coleman holding a knife to his neck.   *Id*. at *15.   Petitioner told Renee Coleman and Jointer that he wanted to leave the apartment.   *Id*.   Renee Coleman grabbed a knife from the kitchen and told

11

Petitioner to let Anthony go. *Id*. Renee Coleman and Jointer also started yelling at Petitioner. *Id*.

Petitioner claims he told Renee Coleman and Jointer to tie up Pedro, which they did. *Id*. He then instructed Renee Coleman to tie up Jointer and Anthony Coleman. *Id*. Petitioner claimed that Renee Coleman tried to attack him after tying up Anthony. *Id*. He says he stuck out his knife and Renee Coleman ran into it. *Id*. Petitioner then swung the butcher knife at Renee and eventually tied her up. *Id*.

Jointer convinced Petitioner to untie her. *Id*. They went to the living room where they smoked cocaine and Petitioner attempted to have sex with her. *Id*. Petitioner says he felt a rush to his head and ran to the bathroom to throw up. *Id*. He then told Jointer to stand in the bathroom and not move. *Id*. He drank water in the kitchen, grabbed a knife, and tied Jointer with a television cord taking her to the back bedroom. *Id*.

Finally, Pedro broke out of his restraints and began attacking Petitioner. *Id*. Petitioner then stabbed all the victims. *Id*. Petitioner made clear that Orange was not in the apartment when the stabbings occurred and did not participate in the killings. *Id*.

Orange testified on his own behalf at his trial consistent with Petitioner's testimony. *Illinois v. Orange*, 521 N.E.2d 69, 72 (Ill. 1988). He claimed he left the apartment around 2:30 a.m., and went to the home of his friend, Shirley Evans, where he stayed until 8:00 a.m. *Id*. Evans testified on Petitioner's behalf corroborating his alibi. *Id*.

Orange claimed that his statement he made to the police following his arrest was the result of physical abuse by the police. *Id*. The prosecution had introduced both Orange and Petitioner's statements made to the police following their arrests at Orange's trial. *Id*. The police

officers who interrogated Orange testified at his trial denying any abuse. *Id*. A doctor who examined Orange at the Cook County Jail two days after his arrest testified that Orange claimed that the police had stuck needles into his back or buttocks and had squeezed his testicles, but the doctor said he found no evidence of abuse during his exam. *Id*.

Orange was convicted of the murders, concealment of a homicidal death, and aggravated arson, but not guilty of armed robbery of Pedro, and the trial court sentenced him to death. *Id*. at 71-72. The aggravated arson conviction was reversed on appeal, but his remaining convictions and death sentence were affirmed. *Id*. at 82. The Illinois courts denied Orange's postconviction petition. *Illinois v. Orange*, 749 N.E.2d 932 (Ill. 2001). Then-Governor George Ryan pardoned Orange on the basis of innocence in 2003. *Orange v. Burge*, No. 04 C 168, 2006 WL 2567786, at *1 (N.D. Ill. Aug. 15, 2006). Following the pardon, Orange brought a federal civil rights suit resulting in a $5.5 million dollar settlement with the City of Chicago, and an undisclosed amount with Cook County. *Orange*, No. 04 C 168, Dkt. 551, pg. 3, Dkt. 593, 597.

### c. Petitioner's Confession at his own Sentencing Hearing

In August 1985, Petitioner pled guilty to the murders and associated charges in this case. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *2. He testified at the sentencing hearing consistent with his testimony at Orange's trial. *Id*. at *15. He again confessed that he stabbed all four victims following a dispute with Pedro. *Id*. at *16. Petitioner was sentenced to death. *Id*. at *2. Petitioner's guilty plea was vacated on direct appeal and the case remanded for trial because the trial court failed to properly admonish Petitioner regarding the minimum and maximum penalties when he pled guilty. *Id*. (citing *Illinois v. Kidd*, 544 N.E.2d 704 (1989)).

### B.    Petitioner's Motion to Suppress his Confession from Area 2

On remand, in 1992, Petitioner brought a motion to suppress his original confession made in police custody at Area 2.   *Id*. at *2.   Petitioner did not testify at the suppression hearing, instead swearing that the allegations in the motion were true and standing on the motion.   *Id*.   He alleged his confession resulted from physical torture by the police, an arrest without probable cause, and a *Miranda* violation.   *Id*.

Petitioner claimed that Flood handcuffed him to a pole in the interview room at Area 2 following his arrest and slapped his face.   *Id*.   Flood and McGuire allegedly then produced an electrical device, forced him to stand, lowered his pants, and attached a piece of cable to his testicles resulting in an electric shock to Petitioner.   *Id*.   Flood also put a phone book by Petitioner's head and struck the book with a piece of wood according to Petitioner.   *Id*.

Petitioner claimed that Flood told him that he would be released from custody if he would lead the police to the knives and if his fingerprints were not on the knives.   *Id*.   Flood and McGuire then took Petitioner to an alley where they threatened to "blow his brains out."   *Id*.   Petitioner then directed the officers to the charred debris and drug paraphernalia.   *Id*.

Upon returning to Area 2, the officers allegedly told Petitioner that Orange had confessed, instructed him to remember where the knives were located, and told him they would then let him go.   *Id*.   Petitioner claims he asked Flood and McGuire if he could make a telephone call so his mother could secure him an attorney.   *Id*.   Petitioner claims the officers refused his request.   *Id*.   He was then taken to where the knives were recovered.   *Id*.   Petitioner also claims he was under the influence of alcohol and cocaine at the time he made the recorded statement to ASA Dernbach.   *Id*.

A hearing was held on the motion to suppress on February 17, 1993. *Id*. McGuire, Flood, Dernbach, and Chicago Police Detective Leonard Bajenski testified at the suppression hearing denying Petitioner's allegations. They claimed they treated Petitioner properly never striking him or using electric shock on him. *Id*. at *3-*5. Dernbach testified that Petitioner told him he was treated well by the police, had been allowed to smoke cigarettes and drink coffee, and did not appear to be under the influence of drugs or alcohol. *Id* at *5. Dernbach said he did notice a mark on Petitioner's head, but Petitioner explained he suffered that injury two weeks earlier during an unrelated robbery. *Id*.

The trial court denied the motion crediting the police officer and ASA's testimony over Petitioner's allegations. *Id*. at *5. The trial court concluded there was no evidence that Petitioner "was struck, mistreated, abused," or "in any way forced to make the statement." *Id*. Finding the statement was voluntary, the court allowed its introduction at trial. *Id*.

### C.    Petitioner's Conviction, Direct Appeal and Postconviction Proceedings

Petitioner proceeded to trial where the aforementioned evidence was introduced. The only evidence at trial not previously discussed in this opinion is Petitioner's evidence from a psychologist specializing in neuropsychology. *Id*. at *17. Following an examination of Petitioner and his school record, Petitioner's expert concluded that he suffered from an organic brain impairment and was mentally retarded. *Id*. She calculated Petitioner's IQ at 73, and concluded his reading, spelling, and math abilities were below a third-grade level. *Id*.

The jury found Petitioner guilty on all counts, and following a death penalty hearing, sentenced him to death. *Id*. at *18. The conviction and death sentence were affirmed on direct appeal. *Id*. (citing *Illinois v. Kidd*, 675 N.E.2d 910 (Ill. 1996)). Petitioner's death sentence was

commuted to a life sentence without the possibility of future release by then-Governor George Ryan in 2003. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *1.

Of relevance to the present habeas corpus petition, the Supreme Court of Illinois on direct appeal, among the multiple claims raised by Petitioner, concluded that "there was no showing here that [Petitioner] sustained any injury while in police custody." *Kidd*, 675 N.E.2d at 923. Regarding the mark on Petitioner's forehead, Petitioner had explained that it had happened a week or two earlier when he was a victim of a robbery. *Id*. According to the Supreme Court of Illinois, there was no testimony or documentary evidence suggesting that Petitioner had any other injury besides the mark on his head. *Id*. In sum, the Supreme Court of Illinois concluded that the trial court was "entitled to credit the testimony introduced by the prosecution" when denying Petitioner's motion to suppress his confession. *Id*.

The Supreme Court of Illinois also allowed the introduction of Petitioner's statement at his sentencing hearing following his guilty plea at his retrial despite the reversal of his guilty plea on appeal. *Id*. at 925. The court concluded, "there was no causal connection between the trial judge's failure to properly admonish [Petitioner] about his minimum sentence [resulting in the vacating of the guilty plea on appeal] and [Petitioner's] subsequent testimony at the sentencing hearing, during which he admitted his involvement in the crimes." *Id*. The court found that Petitioner "voluntarily chose to testify" at his original sentencing hearing. *Id*.

Petitioner filed a *pro se* postconviction petition in December 1995. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *18. This petition made no reference to Jon Burge. *Id*. However, in 2000, Petitioner filed an amended postconviction petition alleging that Burge, and several other officers, along with those previously mentioned, tortured him at Area 2. *Id*.

16

The amended petition alleged that the officers held a plastic bag over Petitioner's head, kneed him in the groin, beat him by striking a phone book which was placed over his head, slapped and punched him, attached cables from a black box to his testicles and electrocuted him, threatened to kill him, and forced him to walk barefoot through the snow.  *Id*.

In 2010, Petitioner filed a second amended postconviction petition asserting eight separate claims.  (Dkt. 4-1, pg. 4-5.)   Of relevance to this case, Petitioner asserted the claims he raises in the present habeas corpus petition.   In sum, that he was tortured to confess by the Chicago police, including Jon Burge, and that his lawyer was ineffective for failing to investigate and present then available evidence supporting his coerced confession claim at the 1993 suppression hearing.  *Id*. The postconviction petition was denied by the state trial court on the pleadings without discovery or an evidentiary hearing, (Dkt. 1-2.) and the Appellate Court of Illinois affirmed.   No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *1.   Petitioner's postconviction proceeding concluded with the denial of his petition for leave to appeal (PLA) by the Supreme Court of Illinois.   *Illinois v. Kidd*, No. 120819, 60 N.E.3d 878 (Ill. Sept. 28, 2016) (Table).   Petitioner now brings his present amended habeas corpus petition before this Court.   (Dkt. 4.)

## II.    Analysis

Petitioner argues that: the state court erred in failing to suppress his confession given to the police because it was the product of police torture (Claim One), his trial attorney was ineffective for failing to investigate and present evidence supporting his coerced confession claim at the suppression hearing (Claim Two), and the state court made an unreasonable determination of fact that he was not tortured by the police (Claim Three).   Respondent asserts that, because Petitioner is serving a life sentence without the possibility of release for the unrelated 1980 murder

convictions, the Court need not reach the merits under the concurrent sentence doctrine. Respondent also responds on the merits. When addressing the merits, the Court considers Claim One and Three together as they both go to Petitioner's torture allegations, before proceeding to the ineffective assistance of counsel issue in Claim Two.

### A. Concurrent Sentence Doctrine

The concurrent sentence doctrine is a discretionary judicial doctrine allowing "appellate courts to decline to review a conviction carrying a concurrent sentence when one 'concurrent' conviction has been found valid." *Cheeks v. Gaetz*, 571 F.3d 680, 689 (7th Cir. 2009) (citing *United States v. Kimberlin*, 675 F.2d 866, 867 (7th Cir. 1982)). Although the doctrine speaks of an appellate court reviewing convictions, the Seventh Circuit has applied it to collateral review of state court convictions in a federal habeas corpus proceeding. *Cheeks*, 571 F.3d at 689-90. The doctrine requires: (1) an equal or longer sentence on an unchallenged or affirmed conviction; and, (2) no adverse collateral consequence to the prisoner by declining to review the challenged conviction. *Hill v. Werlinger*, 695 F.3d 644, 649 n.1 (7th Cir. 2012).

Respondent argues the Court should apply the doctrine because of Petitioner's 1980 murder case. Review of that case, resulting in a life sentence without the chance for future release, is complete. *Kidd*, 734 F.3d at 697. In sum, Respondent argues that regardless of what happens in this case, Petitioner will spend the rest of his days in prison for the 1980 case.

The Court declines to apply the concurrent sentence doctrine due to the presence of collateral consequences. A monetary issue establishes collateral consequences preventing the application of the concurrent sentence doctrine. For example, Congress effectively abrogated the concurrent sentence doctrine for federal convictions by requiring convicted defendants to pay a

18

$100 special assessment for each separate felony conviction.  *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012) (citing *Ray v. United States*, 481 U.S. 736 (1987); 18 U.S.C. § 3013(a)(2)). Although Petitioner is not a federal prisoner facing a $100 special assessment and the parties do not discuss whether there is a similar assessment for his state convictions, there is a potential monetary issue creating collateral consequences associated with this case.

As mentioned, Orange ultimately received a multi-million dollar settlement in his civil rights suit following his pardon.  The pardon helped to clear the way for Orange's civil lawsuit, *Orange v. Burge*, No. 04 C 168, 2006 WL 2567786, at *6, while Petitioner's present convictions may bar some of his claims in a possible civil rights suit because of *Heck v. Humphrey*, 512 U.S. 477 (2014).  *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014).  Petitioner's success in this case may not free him from prison due to the life sentence in the 1980 case, but it may remove a barrier to a civil rights lawsuit like Orange's.  If a $100 special assessment is sufficient to establish collateral consequences, progressing towards a multi-million dollar civil rights lawsuit should as well.  Respondent's concurrent sentence doctrine argument is rejected.

### B.  Petitioner's Claims

#### 1.  Claims One and Three:  Coerced Confession Claims

Petitioner argues in Claim One that the state court erred in rejecting his claim that the police coerced his confession at Area 2 and the confession was wrongfully introduced evidence at his trial.  (Dkt. 4, pg. 19-25.)  Claim Three argues the state court made an unreasonable determination of fact concluding that Petitioner was not tortured, and that Jon Burge was not involved in torturing Petitioner.  *Id*. at 33-36.

These claims are governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or unless the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

## A.      Claim One is without Merit under the AEDPA

Petitioner presented his coerced confession claim both on direct appeal and in his postconviction proceedings. The Supreme Court of Illinois affirmed the trial court's denial of the motion to suppress on direct appeal. *Kidd*, 675 N.E.2d at 924 ("The testimony at the suppression hearing established that [Petitioner's] statements were not the products of coercion."). The state postconviction court did not reach the merits of Petitioner's renewed attempt to raise the claim a second time, instead concluding it was barred by the application of *res judicata* in accordance with the procedural requirements of the Illinois Post Conviction Hearing Act. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *27.

"The operative decision under review [by this Court] is that of the last state court to address a given claim on the merits." *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015) (citing *Greene v. Fisher*, 565 U.S. 34, 40 (2011)). A consequence of the Illinois postconviction court's *res*

20

*judicata* finding is that this Court's review of Claim One is limited to the Supreme Court of Illinois's decision on direct appeal. *Sutherland v. Gaetz*, 581 F.3d 614, 616 (7th Cir. 2009). It is true that the state postconviction petition proceedings examined the underlying evidence relating to Petitioner's coerced confession claim, but it is clear that this was done only within the context of holding that Petitioner could not raise the claim a second time in the postconviction proceeding, a procedural ruling. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *25-*26.

Petitioner counters that the postconviction appellate court's *res judicata* conclusion was a merits determination resulting in this Court reviewing the postconviction proceedings in addition to direct appeal. (Dkt. 18, pg. 3 n.1.) He is correct, as a general principle, that there is case law stating that a *res judicata* finding by an Illinois postconviction court is a "merit based" determination. *Page v. Frank*, 343 F.3d 901, 907 (7th Cir. 2002). The case law he invokes, however, is from an unrelated principle that a state court's *res judicata* finding in a postconviction proceeding, although a procedural ruling, is not an adequate and independent ground of decision for procedural default in federal court. *Davis v. Lambert*, 388 F.3d 1052, 1058 (7th Cir. 2004). This principle is inapplicable here as Respondent is not raising an adequate and independent state ground of review procedural default argument in Claim One.

What is relevant to the instant issue is that the state postconviction court's "invocation of *res judicata* 'simply means that the state courts have already resolved the matter and want nothing more to do with it.'" *Moore v. Bryant*, 295 F.3d 771, 776 (7th Cir. 2002) (quoting *Porter v. Gramley*, 112 F.3d 1308, 1316 (7th Cir. 1997)); *Illinois v. Blair*, 831 N.E.3d 615 (Ill. 2005) ("The doctrine of *res judicata* bars consideration of issues that were previously raised and decided on direct appeal."). In this context, the state postconviction court's "judgment of *res judicata* is not

an adjudication on the merits," meaning that the Supreme Court of Illinois's ruling on direct appeal (reviewing the suppression hearing) is the relevant decision for the Court's review for Claim One. *Sutherland*, 581 F.3d at 616.

The Due Process Clause of the Fourteenth Amendment forbids the admission of an involuntary confession into evidence in a state criminal prosecution. *Miller v. Fenton*, 474 U.S. 104, 109 (1985); *Dassey v. Dittmann*, 877 F.3d 297, 303 (2017) (en banc). "Physically abusive interrogation tactics [] constitute coercion *per se*." *Dassey*, 877 F.3d at 303 (citing *Stein v. New York*, 346 U.S. 156, 182 (1953), *overruled on other grounds by Jackson v. Denno*, 378 U.S. 368, 381 (1964); *Brown v. Mississippi*, 297 U.S. 278, 279 (1936); *United States v. Jenkins*, 938 F.2d 934, 938 (9th Cir. 1991); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986)). The prohibition against physical coercion is "absolute." *Dassey*, 877 F.3d at 303 (citing *Mincey v. Arizona*, 437 U.S. 385, 401 (1978); *Brown*, 297 U.S. at 279).

The Court considers the totality of the circumstances to determine if a confession is the product of unlawful coercion. *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *Dassey*, 877 F.3d at 303 (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993); *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973)). The issue of the voluntariness of a confession is a legal question, *Fulminante*, 499 U.S. at 287; *Miller*, 474 U.S. at 110, and thus is reviewed under 28 U.S.C. § 2254(d)(1). *See Kimbrough v. Neal*, 941 F.3d 879, 881 (7th Cir. 2019); *Lee v. Kink*, 922 F.3d 772, 775 (7th Cir. 2019); *Dassey*, 877 F.3d at 312 (applying § 2254(d)(1) to involuntary confession claim in a habeas corpus proceeding); *Hinton v. Uchtman*, 395 F.3d 810, 819 n.7 (7th Cir. 2005) (applying § 2254(d)(1) to habeas corpus claim that prisoner was physically coerced into confessing by Chicago Police officers at Area 2 headquarters in November 1983).

The Court's review of a claim "under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181. The focus of § 2254(d)(1) review is "'backward looking,'" with the Court's examination limited to "'what a state court knew and did'" at the 'time the state court renders its decision.'" *Greene*, 565 U.S. at 38 (quoting *Cullen*, 563 U.S. at 182); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (emphasis omitted).

While the question of whether a confession was voluntary is a legal question, subsidiary factual determinations made by the state court, including credibility determinations, are questions of fact afforded a presumption of correctness under § 2254(e)(1), and Petitioner has the burden of rebutting the presumption with clear and convincing evidence. *Brumfield*, 135 S. Ct. at 2282; *Miller*, 474 U.S. at 112; *Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020); *Hinton*, 395 F.3d at 819.

Turning to the relevant state court decision for Petitioner's coerced confession claim, (Claim One) from the Supreme Court of Illinois on direct appeal, this Court concludes that the state court decision is neither contrary to, nor an unreasonable application of, clearly established federal law from the Supreme Court of United States.

"A state court's decision is 'contrary to ... clearly established Federal law' 'if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases,' or 'if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's.]'" *Bell v. Cone*, 543 U.S. 447, 452-53 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)); *Weaver v. Nicholson*, 892 F.3d 878, 882 (7th Cir. 2018). In the instant case, the Supreme Court of Illinois identified the

controlling legal standard for Petitioner's coerced confession claim. *Kidd*, 675 N.E.2d at 923 ("Voluntariness will be determined by considering the totality of the circumstance."). That the Supreme Court of Illinois cited to state court cases instead of federal cases for this standard is of no moment as the state court need not cite to or even be aware of the relevant federal cases as long as the state court identifies the proper standard as was done in this case. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). The legal standard identified and applied by the Supreme Court of Illinois is in accordance with controlling precedent from the Supreme Court of the United States.

The Supreme Court of Illinois's decision rejecting Petitioner's coerced confession claim is also not an unreasonable application of the controlling federal precedent. The Supreme Court of Illinois concluded that there was no reason to disturb the trial court's rejection of Petitioner's motion to suppress. *Kidd*, 675 N.E.2d at 923. It concluded that there was no physical evidence in the record at the suppression hearing that Petitioner suffered an injury in police custody. *Id*. Although a picture taken of Petitioner at the time of his questioning showed a mark on his head, the ASA who took Petitioner's confession at Area 2 testified at the suppression hearing that Petitioner told him that the injury was due to a prior robbery a week or two earlier. *Id*. The ASA and three police officers who testified at the suppression hearing all denied Petitioner's allegations of abuse. *Id*. On the other side, the only evidence presented by Petitioner were his allegations in his motion as he did not testify or provide any other evidence in support of his allegations. *Id*. In sum, the Supreme Court of Illinois framed the issue as a credibility determination. That court explained, "[i]t was the trial judge's responsibility to determine the credibility of the witnesses, and he was entitled to credit the testimony introduced by the prosecution. On this record, we

24

cannot say that the decision to deny the defendant's suppression motion was contrary to the manifest weight of the evidence." *Id*.

As the Supreme Court of Illinois accepted the trial court's finding of facts, this Court reviews the state trial court's determinations from the suppression hearing directly. *Dassey*, 877 F.3d at 316 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)). As mentioned above, the state court factual findings have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Brumfield*, 135 S. Ct. at 2282. The state courts' factual findings are supported by the suppression hearing record and Petitioner does not rebut the presumption of correctness.

The state court is correct that:

- Petitioner did not testify at the hearing and did not present any evidence beyond resting on the allegations in his motion to suppress. (Dkt. 16-7, pg. 2.)

- Detectives McGuire, Flood, and Bajenski testified at the suppression hearing denying each of Petitioner's allegations of abuse. *Id*. at 3-72.

- ASA Dernbach, who was then a Cook County Judge at the time of the suppression hearing, testified that Petitioner told him the mark on his head was from the prior robbery. (Dkt. 16-7, pg. 90.) Equally, Dernbach denied witnessing any mistreatment of Petitioner, and that Petitioner did not tell him of any mistreatment. *Id*. at 76-92.

The Court cannot say that the state trial court made an unreasonable determination crediting testimony from three police detectives and an ASA (who was then a judge) over the allegations in a motion to suppress without any additional testimony or evidence from Petitioner. The trial court was presented with a "classic credibility dispute," on which this Court has "'no license' to disturb." *Winfield*, 956 F.3d at 452 (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

Thus, this case is on all fours with the Seventh Circuit's decision in *Hinton v. Uchtman*, 395 F.3d 810 (7th Cir. 2005). *Hinton's* facts are virtually identical to this case. In that case, the prisoner alleged that in November 1983, the police at Area 2 tortured him into confessing to committing multiple murders over a drug debt. *Id*. at 812, 814. The alleged abuse included: (1) being handcuffed to a wall in the interrogation room; (2) repeatedly kicked in the stomach, slapped in the face, and punched in the head by officers; (3) having a plastic bag put over his head depriving him of air; (4) being denied food, water, and access to a bathroom for 18 hours; and, (5) being subjected to electric shock on his genitals. *Id*. at 814.

Unlike Petitioner, Hinton testified regarding the abuse at a suppression hearing in 1985. *Id*. The prosecution rebutted Hinton's allegations with testimony from multiple Chicago police officers involved with his questioning including Jon Burge, and Detective Bajenski. *Id*. at 815. Bajenski also testified at the suppression hearing in this case. Moreover, the ASA who took Hinton's confession said Hinton made no allegations of abuse at Area 2. *Id*. In denying the suppression motion, the state trial court in Hinton concluded that the issue was a "credibility question," and denied the motion. *Id*.

In affirming the denial of Hinton's habeas corpus petition on the coerced confession claim, the Seventh Circuit held:

> Hinton faces an uphill battle (as he did in the three other courts to render a decision on the same facts) in his attempt to convince us that the trial judge's decision to admit his confession was in error. The only "evidence" that Hinton produced at his suppression hearing in support of his coerced confession claim was his own self-serving statements and testimony. However, he failed to corroborate his allegations of the physical abuse that he alleged he sustained with any evidence, such as eyewitness reports, medical records, and/or photographs, in support thereof, *see Wilson v. City of Chicago*, 6 F.3d 1233, 1236 (7th Cir. 1993). Indeed, his failure to produce any corroborating eyewitness testimony, medical records or supporting evidence at the suppression hearing, dealing with the injuries he alleges he

26

> sustained while in custody, significantly undermines his involuntary confession claim. *See Mahaffey v. Schomig*, 294 F.3d 907, 917 (7th Cir. 2002). Because Hinton failed to offer any evidence at the suppression hearing aside from his own testimony, he presented the trial judge with a clear question of the credibility of the witnesses, which was properly resolved in the State's favor. On habeas review, we are required to accord credibility determinations by a state trial court a "presumption of correctness," and we can only disturb the court's conclusions if Hinton demonstrates with "clear and convincing evidence" that its determinations were erroneous. See 28 U.S.C. § 2254(e)(1); *Sprosty v. Buchler*, 79 F.3d 635, 643 (7th Cir. 1996).

*Hinton*, 395 F.3d at 819.

Like in *Hinton*, the evidence before the state trial court at the suppression hearing was primarily Petitioner's own allegation of abuse. It is true that a picture showing a mark on his head was introduced at the suppression hearing, but the ASA explained the injury was from an unrelated prior incident according to Petitioner, and the trial court accepted that conclusion. There is no evidence in the record before the state trial court at the suppression hearing that suggests its decision to accept the officer's testimony on this point was unreasonable. As in *Hinton*, the Court is presented with the review of a state court ruling that boils down to a swearing contest between the witnesses. *Hinton* mandates that Petitioner's claim must be rejected under these circumstances.

### B. Alternatively, Claim One is Barred by *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

Even if Petitioner's Area 2 confession resulted from police torture, he is not entitled to federal habeas corpus relief if the constitutional violation did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citations omitted). In habeas corpus proceedings, the *Brecht* standard, which is less demanding on the state in contrast to the harmless beyond a reasonable

doubt standard of *Chapman v. California*, 368 U.S. 18 (1967), is applied to review the impact of alleged errors. *Fry v. Pliler*, 551 U.S. 112, 116 (2007). *Brecht* is applied to coerced confession claims reviewed in habeas corpus proceedings. *Hinton*, 395 F.3d at 820-21 (citing *Fulminante*, 499 U.S. at 308; *United States v. Alwan*, 279 F.3d 431, 438 (7th Cir. 2002)).

Under *Brecht's* substantial and injurious effect standard, the error must have resulted in actual prejudice. *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (citing *Brecht*, 507 U.S. at 637). There must be "more than a 'reasonable possibility' that the error was harmful." *Davis*, 135 S. Ct. at 2198 (quoting *Brecht*, 507 U.S. at 637). The "'State is not to be put to the arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'" *Davis*, 135 S. Ct. at 2198 (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam)). In sum, the question for the Court is whether "any potential error caused by the admission of [Petitioner's] confession was harmless in light of the wealth of evidence of his guilt, separate and distinct from his confession." *Hinton*, 395 F.3d at 819 (citations and emphasis omitted).

Independent evidence of Petitioner's guilt unrelated to his challenged Area 2 confession[2] includes:

- Confessing to the murders while testifying under oath at Orange's trial. *Kidd*, 544 N.E.2d at 437; *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *14.

- Confessing to the murders in open court at his original sentencing hearing. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *15.

---

2 The present habeas corpus petition does not argue that the recovered evidence, including the knives with victim Pedro's blood on them, should be suppressed. However, Petitioner led the police to this evidence while under challenged questioning at Area 2 so the Court will not consider it for the present *Brecht* analysis.

28

- Contacting Orange's wife on the day of the killing telling her that he had information that could put Orange and him away for the rest of their lives, and meeting her at the McDonald's that same day telling her that Orange had hired someone to murder Jointer.  *Id.* at \*7-\*8.

- Wearing victim Pedro's watch when arrested by the police.  *Id.* at \*9, \*11.

- Stating "Damn" in response to a firefighter telling him that the victims were dead, and their bodies were recovered from the fire.  *Id.* at \*11-\*12.

Petitioner does not provide a clear explanation in the present habeas corpus petition why he confessed in these two proceedings.   However, in his second amended postconviction petition, Petitioner states he "took full responsibility for the murders" at the behest of his then attorney Earl Washington, who also represented Orange.  (Dkt. 4-1, pg. 52.)   The postconviction petition alleges that Washington and Petitioner colluded to extricate Petitioner and Orange from the charges.  *Id.*   Petitioner claims he agreed to take full responsibility for the murders, and in exchange, Washington and Orange would work to get Petitioner found not guilty by reason of insanity.  *Id.*

The implication is that Washington and Orange allegedly leveraged Petitioner into taking the blame for the present murders by informing the state's attorney's office about the unrelated 1980 murders.   As Petitioner was now also facing the murder charges for the death of 10 children from the 1980 fire, Petitioner faced the possibility of never going free regardless of the outcome of this case.   This could make him more susceptible to admit to the murders in Orange's place. Petitioner also argues that he was "particularly vulnerable" to Washington and Orange's influence because of his diminished mental capacity.  *Id.*

Regardless of Petitioner's true motivations, "litigants must live with the stories that they tell under oath."  *McNary v. Lemke*, 708 F.3d 905, 919 (7th Cir. 2013) (internal quotation marks

and citations omitted). The fact is that Petitioner admitted to the murders on two different occasions in separate court proceedings. *See Hinton*, 395 F.3d at 822 (Wood, J, concurring) ("Coercion or even torture at the confession stage did not give him license to commit perjury."). "[A] confession is often powerful evidence" of guilt. *Premo v. Moore*, 562 U.S. 115, 131 (2011). "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296 (internal quotation marks and citations omitted). Petitioner's two separate open court confessions, along with the other evidence showing his involvement in the murders, is sufficient to cure any issue under *Brecht*. *Hinton*, 395 F.3d at 820-21.

Equally, assuming for argument purposes that Petitioner's allegation is correct and there was an agreement between him, Washington, and Orange, this does not exculpate Petitioner. Most charitably, Petitioner is admitting that he lied under oath as part of a cover up. But concealment of a crime is admissible as consciousness of guilt. *United States v. Skoczen*, 405 F.3d 537, 548 (7th Cir. 2005). That Petitioner wished to conceal the truth about the murders points toward, not away, from his involvement.

Finally, Washington withdrew from representing Petitioner in April 1984, more than a year prior to his in-court confession at Orange's trial in May 1985. *Kidd*, 687 N.E.2d at 964. Petitioner's public defender represented to the trial court that he advised Petitioner of his Fifth Amendment privileged, and recommend that he not testify in Orange's trial. *Id*. His public defender represented that he ascertained, after questioning Petitioner, that it was Petitioner's decision to testify at Orange's trial. *Id*. Petitioner testified at Orange's trial that he was voluntarily testifying after conferring with his lawyer. *Kidd*, No. 2016 IL App (1st) 122605-U,

2016 WL 1273897, at *14.  Petitioner's second in-court confession at his sentencing hearing was even later in August 1985.  *Id*. at *2.  The Court sees no evidence of undue influence by Washington on Petitioner as more than a year passed between the termination of Washington's representation of Petitioner and his in-court confessions where he was represented by different counsel.

Turning to Petitioner's arguments on this point, he asserts that *Fulminante*, which established coerced confession claims are trial errors resulting in the *Brecht* review in this case, involved only threats of physical violence, while this case involves allegations of physical coercion.  (Dkt. 4, pg. 26.)  However, the Seventh Circuit in *Hinton* applied *Brecht* and *Fulminante* in that case which also involved substantially identical allegations of police torture at Area 2.  *Hinton*, 395 F.3d at 820.  Seventh Circuit precedent instructs that *Brecht* and *Fulminante* apply.

Petitioner also argues that his confession at Orange's trial and his original sentencing are the only evidence of his guilt, but this is incorrect.  He says "[n]o eyewitnesses placed [him] at the scene of the crime."  (Dkt. 4, pg. 25.)  Petitioner does not address, however, that all the apartment's residents were murdered (including a nine year old child) suggesting that the victims were killed to eliminate the eyewitnesses following Pedro's stabbing.  Beyond that point, a responding firefighter testified that he spoke to Petitioner at the scene when Petitioner inquired about the victims.  *Id*. at *11.  (It is true that the firefighter admitted on cross examination that he was not 100% sure if Petitioner was the man he spoke to at the crime scene as Petitioner's trial occurred nine and half years after the killings.  *Id*. at *12.)  Petitioner also fails to address that he

was wearing Pedro's watch when he was arrested, or his statements to Orange's wife prior to the arrest implicating himself in the killings.

Petitioner also argues that "the admission of the original confession led to a cascade of other prejudicial evidence against" him. (Dkt. 4, pg. 25.) The Court fails to see the "cascade" suggested by Petitioner. His statements to Orange's wife and the firefighter occurred prior to his arrest. He possessed Pedro's watch at the time of his arrest before any police interrogation. His in-court confessions occurred more than a year after the challenged police questioning at Area 2. There is nothing to suggest that Petitioner's confession at Orange's trial and his sentence was not a product of his own free will. *See Lyons v. Oklahoma*, 322 U.S. 596, 603 (1944) (holding a second confession admissible when obtained twelve hours after original unlawful physically coerced confession because coercion surrounding first confession had sufficiently dissipated to make the second confession voluntary); *United States v. Lopez*, 437 F.3d 1059, 1066-67 (10th Cir. 2006) (applying *Lyons* in finding second confession admissible); *United States v. Ramos-Guerrero*, 145 F. Supp. 3d 753, 766 (N.D. Ill. 2015) (applying *Lyons*). The independent evidence is sufficient to cure any error regarding his Area 2 confession under *Brecht*. *Hinton*, 395 F.3d at 820-21.

In sum, Petitioner is not entitled to relief on Claim One under the demanding AEDPA standard. Additionally, any error regarding the admission of his confession given at Area 2 is harmless under the *Brecht* standard. Claim One is denied.

## C. Claim Three is Barred by the AEDPA

Claim Three argues the state court made an unreasonable determination of fact concluding that Petitioner was not tortured at Area 2 in 1984, and that Jon Burge was not involved in the

32

alleged torture.   To obtain relief, Petitioner must demonstrate that the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   "Under § 2254(d)(2), a state court decision is 'based on an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence.'"   *Pruitt v. Neal*, 788 F.3d 248, 263 (7th Cir. 2015) (quoting *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013)).   The Court's review is deferential under the AEDPA.   "A finding cannot be unreasonable if 'reasonable minds reviewing the record might disagree about the finding in question.'"   *Winfield*, 956 F.3d at 452 (quoting *Brumfield*, 135 S. Ct. at 2277).

The state court considered the question of whether Petitioner was tortured at Area 2 in: (1) the suppression hearing (and direct appeal); and, (2) the postconviction proceedings.   There is no doubt that the factual determinations made by the suppression hearing court in 1993 are reasonable. The record before that court contained only Petitioner's allegation of abuse countered by the testimony from the police officers and ASA denying the abuse.   There was nothing presented to bolster Petitioner's credibility or attack the officers.    The 1993 suppression hearing court was "presented a classic credibility dispute, on whose resolution reasonable minds could differ and which [this Court has] 'no license' to disturb."   *Winfield*, 956 F.3d at 452 (quoting *Marshall*, 459 U.S. at 434).

Unlike in Claim One, the Court is not limited to reviewing the findings at the suppression hearing (and on direct appeal).   The reason is that *Cullen's* rule, of limiting the review to the state court record before that court at the time of the relevant state court decision, applies only to 28 U.S.C. § 2254(d)(1).   538 U.S. at 184-85 & n.7.   Claim One is a § 2254(d)(1) claim, and so

33

*Cullen* controls the Court's review. In contrast, *Cullen's* limitation on the state court record reviewed by the federal court is inapplicable when a prisoner makes a § 2254(d)(2) claim as in Claim Three. *Lee*, 922 F.3d at 775. For Claim Three, this Court examines the state postconviction record and ruling in addition to the suppression hearing record and ruling.

Additionally, the Court can review the state postconviction ruling even though it found Petitioner's claim barred by *res judicata*, a state procedural ruling, because the Court is reviewing the state's factual determinations. A "state court's refusal to consider evidence can render its decision unreasonable under § 2254(d)(2) even when its legal analysis satisfies § 2254(d)(1)." *Lee*, 922 F.3d at 775. State courts cannot "insulate their decisions from federal review by refusing to entertain vital evidence." *Id*. *Lee* summarizes what Petitioner is arguing in Claim Three. He attempted to introduce new evidence in the postconviction proceeding in support of his coerced confession claim. Petitioner believes that the state postconviction court erred in refusing to "entertain [this] vital evidence" that demonstrates he was coerced into confessing at Area 2. *Id*. Thus, it is proper for the Court to review the postconviction decision under § 2254(d)(2).

As Petitioner argues that he was coerced into confessing at Area 2, the Court sets forth all available evidence in the record before turning to the review of the state appellate court's postconviction ruling. The evidence in the record shows that Petitioner was arrested on the day of the murders, January 12, 1984, and questioned overnight at Area 2 until the next morning. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *1-*2. In the interview with ASA Dernbach on January 13, 1984, at 2:50 a.m., and transcribed by a court reporter, Petitioner told Dernbach that he was "treated all right here in the police station." (Dkt. 16-18, pg. 90.)

34

Petitioner made an immediate outcry of abuse on two separate occasions on January 14, 1984, following his release from Area 2. At approximately 5:20 p.m. that day, a medical examination was conducted on Petitioner as part of his intake at the Cook County Jail. (Dkt. 4-4, pg. 257.) Although the copy of the doctor's report from the examination is extremely difficult to read, it is clear that Petitioner complained that the police physically assaulted him on January 12th and 13th, while in custody at Area 2. *Id.* The doctor diagnosed Petitioner with soft tissue trauma and prescribed him 600 mg of aspirin.[3] *Id.* at 259. The doctor's report also notes three cuts on Petitioner's face above and below his left eye. *Id.* at 258.

Earlier that same day, Petitioner and Orange appeared in the Circuit Court of Cook County for a bond hearing. (Dkt. 4-5, pg. 213.) Cook County Assistant Public Defender Jeffrey M. Howard represented them at the hearing. *Id.* Howard noted for the record that Petitioner was injured, and came into court limping. *Id.* at 214. Petitioner informed the court, "I am hurting between my legs where they jumped on me, and made me tell that I had said I done something." *Id.* Orange told the court during that same hearing, "I got pin marks on my butt. Only bruise I got to show. Other things happened. That is all that is visible right now." *Id.* at 215.

Mr. Howard provided an affidavit in 2000, stating that either Petitioner or Orange complained to him when being brought out from the lockup for the January 14, 1984, hearing that the "police used a 'black box' to electro-shock him." (Dkt. 4-5, pg. 210, ¶ 5.) Howard said he could not remember whether Petitioner or Orange told him about the black box. *Id.* He explains

---

3 The medical report reads "Treatment / Advice: ASA 600" followed by illegible text. (Dkt. 4-4, pg. 259.) The Court interprets this entry to mean that Petitioner received 600 mg of aspirin as aspirin is also known as acetylsalicylic acid (ASA). Wikipedia, Aspirin, *available at* https://en.wikipedia.org/wiki/Aspirin (last visited May 18, 2020).

that he did not report the black box electro-shock allegation on the record at the bond hearing because he had not heard of this type of complaint before, and did not want to convey information to the court that he "thought at that time might damage [Petitioner and Orange's] credibility." *Id*. at pg. 210, ¶ 6.

The record details three photographs taken of Petitioner around the time of the police interrogation. The pictures are not in the record; the record only provides descriptions of the pictures. The photographs are: (1) the arrest photo in Petitioner's police file; (Dkt. 4-4, pg. 240); (2) the photo taken at the completion of Petitioner's statement to ASA Dernbach at Area 2 on the early morning of January 13, 1984; and, (3) the intake photo at Cook County Jail taken on January 14, 1984. *Kidd*, 675 N.E.2d at 923. All three photos purport to show injuries around the left side of Petitioner's head and eye. *Id*.

Dernbach testified at the suppression hearing that Petitioner related to him during the questioning at Area 2 that his injuries were from an unrelated robbery occurring a week or two prior to his arrest. *Kidd*, 675 N.E.2d at 26. In a 2004 statement given under oath to the Special Prosecutor investigating allegations of police abuse under Burge, Dernbach explained that Petitioner had "a little mark, about the size of a dime or something" on his forehead with no visible blood. (Dkt. 4-3, pg. 389.) He characterized it as a "little tiny scratch or something," and said it appeared that it "looked old" when Petitioner was at Area 2 in January 1984. *Id*.

Beginning in the late 1980s, the Chicago media began reporting on allegations of systemic physical abuse and torture involving Jon Burge and the Chicago Police Department following the Andrew Wilson case. *United States v. Burge*, No. 08 CR 846, 2009 WL 2386147, at *1 (N.D. Ill. July 29, 2009). In 1987, the Supreme Court of Illinois overturned Wilson's convictions for

36

murdering two Chicago Police officers on the ground that his confession was coerced. *Wilson v. City of Chicago*, 6 F.3d 1233, 1236 (7th Cir. 1993) (citing *Illinois v. Wilson*, 506 N.E.2d 571 (1987)). "Wilson had 'testified that he was punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator throughout the day on [February 14, 1982, the day of his arrest,] until he gave his confession," and his testimony had been corroborated by extensive contemporaneous medical and photographic evidence." *Wilson*, 6 F.3d at 1236 (quoting *Wilson*, 506 N.E.2d at 573).

As a result, the Chicago Police Department's Office of Professional Standards conducted an investigation of Burge and those under his command at Area 2. *Burge*, No. 08 CR 846, 2009 WL 2386147, at *1. This investigation resulted in the police department's Sanders and Goldston Reports in November 1990. (Dkt. 4-6, pg. 106.) The Sanders report concluded that Burge was actively involved in the "mistreatment" of Wilson including burning Wilson on the radiator, repeatedly shocking him, and engaging in several unjustified physical altercations including when Wilson was handcuffed and unable to provide any resistance. *Illinois v. Patterson*, 735 N.E.2d 616, 643 (Ill. 2000).

The Goldston report concluded that the preponderance of the evidence demonstrated that physical abuse systematically occurred at Area 2. (Dkt. 4-6, pg. 112.) The report documented 50 different suspects alleging abuse by Area 2 officers between 1973 and 1986. *Orange*, 749 N.E.2d at 937. Allegations included 27 incidents of beatings, 13 incidents where a plastic bag or typewriter cover was placed over a suspect's head, 11 incidents where a firearm was used to threaten or strike a suspect, 9 incidents of electroshock, and 2 hanging incidents. *Id*. Burge "'repeatedly appeared as connected to alleged acts of abuse.'" *Id*. The report also identified five

37

other officers as suspected of committing abuse in addition to Burge.  *Id.*   Burge is listed as the accused torturer in Petitioner's case in the Goldston report.   (Dkt. 4-6, pg. 125.)

Burge did not testify at the suppression hearing or Petitioner's trial.   In fact, the state court granted the prosecution's unopposed motion in limine at Petitioner's 1993 trial barring any mention of Burge as Petitioner made no allegation at that time against Burge.   (Dkt. 16-8, pg. 6.) However, in his affidavit in support of his 2000 postconviction petition, Petitioner alleged that Burge participated in the abuse with the other previously named officers.   (Dkt. 4-2, pg. 6-8.)

Beyond Petitioner's affidavit, two police documents from 1984 link Burge to the case. The first is the police progress report completed on the day of the killings detailing the investigation and arrest.   (Dkt. 4-4, pg. 197.)   The report identifies the 40 Chicago police personnel assigned to the case ranging from parole officers to a commander.   *Id.* at 203.   The report lists "Lt. Burge Unit Commander" as one of the 40 assigned officers.   *Id.* at 204.

Additionally, on September 27, 1984, the Chicago Superintendent of Police issued a Department Commendation for Burge, three sergeants, and 16 detectives, for their work in the case.   (Dkt. 4-7, pg. 3.)   The commendation stated that the group, including Burge, "commenced a systematic and non-stop investigation."   *Id.*   Burge is the ranking officer on the commendation. *Id.*   *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *23.   Burge also called Dernbach to come to the police station to interview Petitioner and Orange on the night of their arrest and questioning.   *Id.*

The Goldston report was partially released to the public in 1992, and Judge Ruben Castillo ordered the full report released in May 1997.   *Id.* at *26 (citing *Wiggins v. Burge*, 173 F.R.D. 226, 230 (N.D. Ill. 1997)).   The Chicago Police Department fired Burge in 1993 for physically abusing

Wilson, allowing others to do so, and denying Wilson medical treatment. *Burge*, No. 08 CR 846, 2009 WL 2386147, at *1.

In 2002, Judge Paul Biebel, the presiding judge of the Circuit Court of Cook County, Criminal Division, appointed a special prosecutor to investigate allegations of misconduct against Burge and those working under his command, and to determine if criminal charges should be brought against them. *Burge*, No. 08 CR 846, 2009 WL 2386147, at *2. Following an investigation, the Special Prosecutor's report concluded that it did "not believe Leonard Kidd['s]" abuse allegations. Petitioner, who was interviewed by the Special Prosecutor in 2004, mentioned Slick Rick and Ricky Jones in his interview. (Dkt. 16-18, pg. 117.) He claimed that Slick Rick and Jones were the actual killers, and convinced Petitioner into confessing to the murders by threatening to kill Petitioner's mother. *Id*. Petitioner said during his 2004 interview that he no longer felt afraid of Slick Rick after Petitioner's mother moved to California. *Id*. at 118. However, Petitioner also presented a conflicting explanation in his 2004 interview stating that he pled guilty as part of the agreement with Orange and Washington. *Id*. at 117.

The Special Prosecutor also noted that Petitioner made no mention of Burge until 2000. *Id*. at 118. His testimony to the Special Prosecutor also improperly stated he was tortured for three days at Area 2 when the record is clear that he was at Area 2 for approximately a day. *Id*.

As mentioned above, then-Governor George Ryan pardoned Orange on the basis of innocence in 2003, and Orange brought a federal civil rights suit. *Orange*, No. 04 C 168, 2006 WL 2567786, at *1. Ryan also pardoned Madison Hobley, Aaron Patterson, and Stanley Howard in addition to Orange. *Burge*, No. 08 CR 846, 2009 WL 2386147, at *2 n.8. They also filed civil rights suits. During the resulting discovery on the civil rights suits, Burge, Flood, and McGuire

invoked their Fifth Amendment right against self-incrimination. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *26. However, at one prior point, Burge answered discovery under oath in Hobley's case denying any knowledge or participation in abuse at Area 2. *United States v. Burge*, 711 F.3d 803, 807 (7th Cir. 2013). He was convicted for obstructing an official proceeding and perjury for the statements made in the *Hobley* case, and sentenced to 54 months in federal prison. *Id*. at 807-08.

The aforementioned evidence can be divided into two groups: (1) evidence that was available in 1993 and could have been presented at the suppression hearing, but was not; and, (2) later discovered or occurring evidence not available for introduction at the 1993 suppression hearing. The claim that trial counsel failed to develop and introduce evidence at the suppression hearing is an ineffective assistance of counsel claim which is raised in Claim Two discussed immediately below. Evidence available in 1993 but not introduced at the suppression hearing include: (1) Petitioner's immediate outcry of abuse the day after his release from Area 2 at the bond hearing and medical examination at the Cook County Jail along with the supporting medical record; (2) photographs showing injuries to Petitioner's face taken at the time of his arrest, questioning at Area 2, and intake at Cook County Jail; (3) the testimony from Petitioner's public defender at the bond hearing stating that either Petitioner or Orange alleged a black box was used to administer electro shock during questioning at Area 2; (4) the police records and commendation mentioning Burge as part of the investigation in this case along with Burge summoning Dernbach to Area 2 to question Petitioner and Orange on the night of their arrest; (5) the portion of the Goldston report made public in 1992; and, (6) media reports and cases, including the Andrew

Wilson case, detailing abuse practices at Area 2. This evidence will be considered as part of the ineffective assistance of counsel claim in Claim Two below.

The evidence relevant to the present claim is the evidence that was not available at the suppression hearing in 1993. This is because the state court's determination on this point was whether Petitioner could bring his coerced confession claim a second time on postconviction review in light of this newly discovered evidence or whether it was barred by *res judicata*. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *25. Thus, the question for this Court for Claim Three is whether the state postconviction court's refusal to consider this new evidence is predicated upon an unreasonable determination of fact.

The first piece of new evidence Petitioner pointed to in his postconviction proceedings was the Special Prosecutor's report. The state postconviction court was not unreasonable in concluding that the report did not support his coerced confession claim. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *25. As the state court properly recognized, the evidence developed by the Special Prosecutor undermined Petitioner's allegations. *Id*. Petitioner's statement to the Special Prosecutor was inconsistent when he said he confessed to the killings because of threats from Slick Rick, while later telling the Special Prosecutor it was part of the plan with Orange and Washington. (Dkt. 16-18, pg. 117-18.) Petitioner also incorrectly claimed he was tortured at Area 2 for three days before the Special Prosecutor, when the record is clear he was in custody for a day. The state postconviction court is correct that the evidence developed by the Special Prosecutor is harmful to Petitioner, not helpful. The state court's factual determination on this point is not unreasonable.

Second, Petitioner pointed to Burge's 2008 federal criminal conviction. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *26. A conviction for lying about torture in a different case is relevant when that officer also participated in the challenged interrogation in this case. *See Wilson*, 6 F.3d at 1238 (citing Fed. R. Civ. P. 404(b)) (holding that other incidents of abuse committed by a police officer is admissible under Rule 404(b) when considering whether officer committed tortured in instant case). The postconviction court concluded that there was insufficient evidence to suggest that Burge was involved in questioning Petitioner. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *23. It is true that the record shows that Burge called Dernbach to come to the police station to interview Petitioner and Orange, and his name is on the progress report and commendation. *Id*. However, the state court's conclusion that "there is no indication that Jon Burge took an active role in questioning" Petitioner is not an unreasonable determination. *Id*.

Petitioner did not name Burge as one of his interrogators in his initial motion to suppress in 1992 or the 1993 suppression hearing. Burge is not identified as an alleged torturer until Petitioner's 2000 postconviction affidavit. *Id*. at *18. The evidence of whether Burge was involved in questioning Petitioner is inconclusive at best. "[I]t [is] not enough for [Petitioner] to show that Burge had tortured or supervised the torture of a substantial number of other arrestees. [Petitioner must] offer some evidence indicating that he himself was the victim of this abuse." *Hinton*, 395 F.3d at 822 (Wood, J., concurring)

The Court may find only that the state court made an unreasonable determination of fact when that court "ignores the clear and convincing weight of the evidence.'" *Pruitt*, 788 F.3d at

263. The record is inconclusive as to whether Burge interrogated Petitioner, not the required "clear and convincing" evidence. The state appellate court's determination is not unreasonable.

The last evidence the state postconviction court considered is a group of items going to the credibility of the officers who testified at the suppression hearing. This includes subsequent cases demonstrating torture at Area 2, the remaining portion of the Goldston report released in 1997, and Flood and McGuire's invocation of their Fifth Amendment rights in subsequent civil rights litigation involving Area 2 abuse claims. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *26.

The state postconviction court did not make an unreasonable determination in rejecting this evidence. Most notable is the officers' subsequent invocation of their Fifth Amendment rights. *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) (explaining that it is proper to consider a party's invocation of his Fifth Amendment right in a civil proceeding with resulting negative inference when witness credibility is at the core of case). (The Goldston report also mentions Flood as an officer suspected of abusing a suspect in a different case). *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *26. As mentioned above, the officers' credibility was the linchpin of the ruling at the suppression hearing as the trial court was presented with a swearing contest. The officers' credibility is now suspect in light of invoking their Fifth Amendment rights in the civil litigation.

The state postconviction court concluded that this issue was irrelevant in light of the independent evidence supporting Petitioner's guilt beyond his Area 2 confession. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *26. That is a reasonable determination. As

43

previously explained, the independent evidence of Petitioner's guilt cures any issue regarding his confession at Area 2.

In sum, the state postconviction court did not make an unreasonable determination of fact rejecting Petitioner's new evidence in support of his coerced confession claim. Moreover, even if one concludes that the state court erred in rejecting that evidence and Petitioner was coerced into confessing at Area 2, the independent evidence of Petitioner's guilt unrelated to his Area 2 confession is sufficient to cure any issue. Claim Three is denied.

### 2. Claim Two: Ineffective Assistance of Counsel Claim

Petitioner's final claim is that his trial counsel was ineffective at his suppression hearing by failing to introduce then available evidence supporting his coerced confession claim. Evidence available in 1993 but not introduced at the suppression hearing include: (1) Petitioner's immediate outcry of abuse the day after his release from Area 2 at the bond hearing and medical examination at the Cook County Jail along with the supporting medical record; (2) photographs showing injuries to Petitioner's face taken at the time of his arrest, questioning at Area 2, and intake at Cook County Jail; (3) the testimony from Petitioner's public defender at the bond hearing stating that either Petitioner or Orange mentioned that a black box was used to administer electro shock during questioning at Area 2; (4) the police records and commendation mentioning Burge as part of the investigation in this case along with Burge summoning Dernbach to Area 2 to question Petitioner and Orange on the night of their arrest; (5) the portion of the Goldston report made public in 1992; and, (6) media reports and cases, including the Andrew Wilson case, detailing abuse practices at Area 2.

Respondent is correct that the claim is procedurally defaulted. Petitioner raised the claim in his postconviction petition proceeding before the trial court and the Appellate Court of Illinois. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *19-*20, *22-*24. However, he did not raise the claim in his postconviction PLA before the Supreme Court of Illinois. (Dkt. 16-24.) Petitioner was required to raise his claim through all levels of Illinois court review including in a PLA. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-46 (1999); *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). His failure to raise the claim in his PLA results in procedural default of the claim.

Petitioner concedes that he did not raise a freestanding ineffective assistance of counsel claim in his postconviction PLA, but asserts that a different claim he did raise in his PLA was sufficient to preserve his ineffective assistance of counsel claim. A claim can be fairly presented to the state court preserving it for federal review even when it is "nested" within another claim when: (1) the claim is presented in a way that it could stand out on its own, or (2) supported by "very substantial analysis" of the issue throughout the pleading. *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). The PLA discussed an unrelated issue of the application of the harmless error standard by the postconviction appellate court. (Dkt. 16-24, pg. 1-20.) There is no discussion of the present ineffective assistance of counsel issue in the PLA. The claim is procedurally defaulted.

Petitioner does not assert cause and prejudice, nor fundamental miscarriage of justice to excuse the default resulting in Petitioner forfeiting those arguments. *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 555 n.6 (7th Cir. 2001). For completeness purposes, the Court also notes

that, even if the forfeiture was set aside, Petitioner could not excuse his defaults under either cause and prejudice, or fundamental miscarriage of justice.

Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest*, 474 F.3d at 930 (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). The first two types of cause are not applicable to this case.

Ineffective assistance of counsel, although requiring more analysis, also does not excuse the default. An ineffective assistance of counsel asserted to excuse a default must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner has not preserved an ineffective assistance of counsel argument to excuse the default of this claim.

Petitioner cannot argue that postconviction counsel's failure to preserve the claim in the postconviction PLA excuses the default. The Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), permitted ineffective assistance of postconviction trial counsel to excuse a defaulted ineffective assistance of trial counsel claim. That is not the case here as the default is from the failure to raise the claim in a postconviction PLA. *Steward v. Gilmore*, 80 F.3d 1205, 1212 (7th Cir. 1996) (holding that ineffective assistance of postconviction appellate counsel does not constitute cause to excuse a default). Moreover,

46

*Martinez* and *Trevino* are inapplicable to Illinois prisoners. *Crutchfield v. Dennison*, 910 F.3d 968, 978 (7th Cir. 2018). Cause and prejudice cannot excuse Petitioner's defaults.

This leaves the fundamental miscarriage of justice (actual innocence) gateway to excuse Petitioner's default. To show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial --- such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --- to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald*, 737 F.3d at 483-84 (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")). Petitioner cannot demonstrate actual innocence in light of the evidence against him --- his statements to Orange's wife, his statement to the firefighter, wearing the victim's watch, and his confessions at his sentencing and Orange's trial.

Beyond default, the ineffective assistance of counsel claim is meritless. Petitioner's ineffective assistance of counsel argument is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, Petitioner must demonstrate both deficient performance and prejudice. *Premo*, 562 U.S. at 121 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Court's review under *Strickland* is deferential, and applying *Strickland*

under the AEDPA (which itself also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123.

Petitioner cannot demonstrate that the postconviction appellate court's rejection of his claim was either contrary to, or an unreasonable application of, *Strickland*. The state court properly identified the *Strickland* standard. *Kidd*, No. 2016 IL App (1st) 122605-U, 2016 WL 1273897, at *22. The state court also properly concluded that Petitioner could not demonstrate prejudice on this claim regarding counsel's alleged failure at the suppression hearing because the trial would not have been different if Petitioner's motion to suppress had been granted. As previously explained, there is abundant evidence to support Petitioner's conviction beyond the challenged Area 2 confession. Even if the evidence available in 1993 was introduced at the suppression hearing and the Area 2 confession was suppressed, the remaining evidence (most notably Petitioner's two other confessions) would have still resulted in Petitioner's conviction. The state court's rejection of Petitioner's claim is reasonable under the deferential AEDPA standard. Claim Two is denied.

## III.   Petitioner's Request for an Evidentiary Hearing

Petitioner's request for an evidentiary hearing is denied. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief . . . . It follows that if the record [] precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *see also* 28 U.S.C. § 2254(e)(2)(B).

As previously explained above, the evidence of Petitioner's guilt outside of his confession at Area 2 (his confessions at his sentencing and Orange's trial, possessing Pedro's watch when arrested, and his statements to Orange's wife and the firefighter) are sufficient to uphold the conviction regardless of any error surrounding the introduction of his Area 2 confession. *Hinton*, 395 F.3d at 820-21. There is no need to hold an evidentiary hearing as to Petitioner's claims because any issue is cured by this independent evidence of his guilt.

The Court denies all claims on the merits and request for an evidentiary hearing. The habeas corpus petition is denied.

## IV.    Certificate of Appealability

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

**V.     Conclusion**

Petitioner's amended habeas corpus petition (Dkt. 4.) is denied on the merits.   Any pending motions are denied as moot.   The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Pfister from the docket; (2) add Petitioner's present custodian, David Gomez, Warden, Stateville Correctional Center as Respondent; (3) alter the caption to *Kidd v. Gomez*; and, (4) enter a judgment in favor of Respondent and against Petitioner.    Civil Case Terminated.

ENTERED:

Dated: June 8, 2020

ROBERT W. GETTLEMAN
United States District Judge